**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 06-20115-Civ-MORENO/TORRES

ALAN KALLAS, *et al.*,

    Plaintiffs,

vs.

CARNIVAL CORPORATION,
individually and d/b/a CARNIVAL
CRUISE LINES, INC., a foreign
corporation, jointly and severally,

    Defendant.
_____/

**ORDER GRANTING DEFENDANTS'** ***DAUBERT*** **MOTION TO EXCLUDE**
**THE TESTIMONY OF DR. NITIN PARANJPE ON THE SUBJECT**
**OF LOST EARNINGS OF HAILEY KALLAS**

This matter is before the Court on Defendant's *Daubert* Motion to Exclude Expert Witness Testimony of Dr. Nitin Paranjpe on the Subject of Lost Earnings of Hailey Kallas Claimed to be the Proximate Result of the Death of Jonathan Kallas. [**D.E. 219**]. After considering the arguments raised in the parties' briefs and the materials filed in support of and opposition to Defendants' motion, we conclude that Dr. Paranjpe's opinion regarding the loss in parental training and guidance as a result of the death of Hailey's father is unreliable under Federal Rule of Evidence 702. Accordingly, we GRANT Defendants' *Daubert* motion to exclude the testimony of this expert on this particular topic for the reasons set forth below.

## I.  BACKGROUND

Plaintiffs, individually and as personal representatives, filed this suit after they allegedly contracted Norovirus (also known as the Norwalk Virus) while passengers aboard Defendants' cruise ship in January 2005.[1]  Plaintiffs claim they became violently ill and that Jonathan Kallas died as a result of ingesting food and/or beverage contaminated with Norovirus.  Plaintiffs generally allege that Defendants prepared and sold the contaminated food and/or beverage; that Defendants failed to adequately and properly clean and/or disinfect the cruise ship so as to prevent the unreasonable risk of passengers contracting Norovirus; and that Defendants failed to advise of precautionary measures that passengers could take to avoid contracting Norovirus and further failed to provide proper medical treatment to those who did contract the disease.

Plaintiffs make the following claims in their Third Amended Complaint:  (1) strict liability (Count I); (2) breach of implied warranties (Count II); (3) breach of express warranties (Count III); (4) negligence (Count IV); and (5) breach of contract (Count V).  [D.E. 55].[2]  Defendants moved for partial summary judgment against Plaintiff Julie A. Kallas as Personal Representative of the Estate of Jonathan A. Kallas, on each of these claims.  The motion for summary judgment was granted as to Counts I-III and V, and denied as to Count IV for negligence.  [D.E. 227].  Plaintiff

---

[1]  Plaintiffs filed this action as an admiralty and maritime claim pursuant to 28 U.S.C. §§ 1331 and 1333 and, for claims related to the injuries and death of Jonathan Kallas, pursuant to the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 30301-30308 (formerly 46 U.S.C. §§ 761-768). [D.E. 55, ¶¶ 1-2, 36].

[2]  Plaintiffs have since dismissed all class claims with prejudice. [D.E. 138].

Julie A. Kallas claims damages suffered by the next of kin as a result of decedent's death, including loss of parental nurture, training, and guidance.

Plaintiffs hired Dr. Nitin Paranjpe ("Dr. Paranjpe") as their economic damages expert to calculate the loss of support and household services of decedent Johnathan A. Kallas and the loss in parental training and guidance for Hailey Kallas, decedent's seven year old daughter. It is his opinions regarding the loss in parental training and guidance for Hailey that are at issue here.

Dr. Paranjpe issued an expert report in which he purported to measure the loss in parental training and guidance to Hailey. [D.E. 172-3 (Paranjpe Expert Witness Report)]. He calculated the loss as the difference between obtaining a high school degree and a college degree. He based this measurement on the premise that children who lose a parent suffer from the loss of parental guidance and support conducive to achieving higher education. In other words, Hailey is at risk for not going to college because she has lost her father and his presumably positive influence; accordingly, she is entitled to the amount of money she may lose out on because of that risk.

Dr. Paranjpe calculated Hailey's projected compensation at age 67 based on her attaining a college degree as $7,839,003 and her projected compensation based on her attaining a high school degree as $4,115,982. [*Id.* at 15]. He explained that "the loss of her father has put her at risk, and as measured by the difference between the college degree compensation and high school compensation of the magnitude of $3,723,022 over four years, or an average of $930,755 per year." [*Id.* at 11].

Dr. Paranjpe cited one article to support his opinion. The article by Robert Haveman and Barbara Wolfe, *The Determinants of Children's Attainments: A Review of Methods and Findings,* 33 JOURNAL OF ECONOMIC LITERATURE 1829, 1832 (Dec. 1995), is "a review and critique [of] the empirical research on the links between investment in children and children's attainment." [D.E. 222-2 at 15 (article at p. 1832)]. Dr. Paranjpe summarized how the article supported his opinion:

> 7. Support for the first part of my opinion (i.e., the economic model of the positive correlation between parental resources and children's attainments) can be found in countless articles. A good example is a survey article "The Determinants of Children's Attainments: A Review of Methods and Findings", by Robert Haveman and Barbara Wolfe, in the Journal of Economic Literature, Vol. XXXIII (December 1995). An economic model of the process of children's attainments ascribed to ***Arlene Leibowitz in 1974***, has the genetic endowments of parents (e.g., their abilities in a number of dimensions) passed along to children via heredity. The abilities of parents and their educational choices jointly determine the level of family income and the quantity and quality of both time and goods inputs (or "home investments") that parents devote to their children. Children's ability and the levels of parental income and home investments in time and goods determine the schooling attained by children, and through schooling, the level of post-schooling investment, (e.g., work experience). ***All*** of these in turn, affect children's earnings and income. Given their abilities, then, parents make a wide variety of decisions- including parental schooling, work effort, consumption, time allocation, and bequests - that are expected to be related to children's schooling and labor market attainments.
>
> 8. Economic theory and logic therefore tell us that removal of parental resources (home investments in children or inputs) will have an impact of ability, educational attainment level, and income (outputs) of children. In this regard, the flowchart presented below is illustrative of the economic model, and the complexities associated with modeling, estimating, and having sufficient data for the measurement of the causal relationships.

[D.E. 222-2 at 2-3 (emphasis in original) (referring to the article at p. 1834)]. Although he claimed that his opinions are based on "countless articles," the only article Dr. Paranjpe cited is Haveman & Wolfe's.

Defendants argue that Dr. Paranjpe's principles and methodology do not conform to generally accepted principles and methodology in the area of forensic economics for determining the lost earnings of a child whose parent has died. Defendants set forth a host of studies and professional opinions that indicate there is no significant statistical difference in educational attainment between children with both parents living or one parent deceased. One such study is by J. Kane, L. Spizman, J. Rodgers, and R. Gaskins, "The Effect of the Loss of a Parent on the Future Earnings of a Minor Child (Using National Longitudinal Survey of Youth Data)," Eastern Economic Association 33rd Annual Conference, presented February 23, 2007, New York, NY (updated for publication June 16, 2008), in which the authors examine the statistical percentage differences in educational attainment for white female children due to the death of their fathers. [D.E. 219 at 3-4]. According to Defendants, the study shows "that for a female child the likelihood of attaining a Bachelor's Degree with both parents present is 13.40% and the likelihood of attaining a Bachelor's Degree with the mother present and the father deceased is 13.31%. The difference, which is less than 1/10th of one percent, is statistically insignificant." [*Id.* at 4].

Defendants also point out that the principle study relied on by Dr. Paranjpe uses a flow chart and "social science perspective" rather than quantitative methods for determining the probability of attaining a given educational level. Defendants further

allege that Dr. Paranjpe fails to consider that educational attainment risk is not a 100% certainty in any case. Defendants point to a number of studies that take into account a variety of variables that may contribute to differences in educational attainment such as parental education and occupation, urbanity, religion, or the presence of newspapers or magazines in the home. Defendants conclude that, for many reasons, Dr. Paranjpe's calculation of Hailey's lost earnings fails to follow the principles and methods generally followed in the field of forensic economics, and should therefore be excluded from trial.

Dr. Paranjpe attempts to refute Defendants' arguments that he did not consider certain allegedly significant factors relating to educational attainment in part by explaining that consideration of such variables is not necessary for an economic analysis of lost income. He also makes various attacks on the literature relied upon by Defendants that purportedly demonstrate there is no statistically significant difference in educational attainment for children with only one surviving parent.

## II.   LEGAL STANDARD

The decision to admit or exclude the testimony of a proposed expert is within the discretion of the trial court. *Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005) (citing *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004)). A court enjoys "considerable leeway" in determining the admissibility of expert testimony. *Id.* The admission of expert testimony is governed by Fed. R. Evid. 702,[3]

---

[3]   Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

as explained by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

The party offering the expert testimony carries the burden of laying the proper foundation, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). The trial court must function as a gatekeeper and engage in a three-part inquiry to determine whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). The Eleventh Circuit has referred to these requirements as the "qualification," "reliability," and "helpfulness" prongs and, although there is inevitably some overlap, they remain distinct concepts that must be individually analyzed. *Frazier*, 387 F.3d at 1260.

The Court's analysis must keep in mind that "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir. 2001) ("A district court's gatekeeper

---

> witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" (quoting *Allison,* 184 F.3d at 1311)). "Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Technology,* 326 F.3d at 1341 (quoting *Daubert,* 509 U.S. at 596).

### III.   ANALYSIS

In determining the reliability of an expert opinion, the Court considers:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Technology*, 326 F.3d at 1341 (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). This list of factors, however, does not exhaust the different considerations that may bear on the reliability of an expert opinion. *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). "A federal court should consider any additional factors that may advance its Rule 702 analysis." *Id.* Some of those factors may apply in a given case, while others may not. "Whether the *Daubert* opinion factors are even pertinent to assessing reliability in a given case will depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire*, 526 U.S. at 150). Expert testimony must be excluded if the reasoning or methodology underlying the opinion is scientifically invalid, or if the methodology cannot properly be applied to the facts. *Daubert*, 509 U.S. at 592.

As previously noted, in his expert report Dr. Paranjpe performed two calculations of Hailey's compensation over her lifetime with an assumed retirement age of 67. [D.E. 172-3 at 11]. One, assuming college education, was estimated at approximately $7.8 million. [*Id.* at 15]. The second calculation, assuming only a high school education, was estimated at approximately $4.1 million. [*Id.*]. Dr. Paranjpe then assumed the death of Hailey's father has put her at risk, as measured by the difference between the two. [*Id.* at 11]. Therefore, he valued the loss to Hailey of parental training and guidance as a result of her father dying as the difference between the two sums, or approximately $3.7 million. [*Id.].*

We find that Plaintiffs have failed to satisfy the reliability prong of *Daubert* with regard to their expert's opinion that the proper measure of the loss of parental guidance and support to a child whose father is deceased is the difference between her projected college degree compensation and her projected high school compensation. Common sense tells us that the loss of a parent may have an impact on a child in many ways, or, as Dr. Paranjpe testified, "[t]he loss of a parent in the household puts a child at risk." [D.E. 172-4 at 8, p. 28 l. 15-16]. But the rest of Dr. Paranjpe's theory is not supported by any data or analysis that has been provided to us.

Dr. Paranjpe opined that the risk Hailey potentially will suffer is a loss in educational attainment, and because of that she will suffer a loss in future income. Setting aside the affidavits of Oscar J. Padron and Professor Lawrence M. Spizman (filed by Defendants in support of excluding Dr. Paranjpe's testimony on this topic), we find nothing in the literature cited by Plaintiffs that sufficiently supports his theory

that the death of a father translates into the lowering of educational attainment and a corresponding loss of income for a young child such that it can be deemed reliable for purposes of Rule 702 and trial.  The article on which Dr. Paranjpe relies, by Haveman & Wolfe, does not support this theory.

That article, relying on an economic model presented by Arlene Leibowitz, states that a child's ability and the levels of parental income and home investments in time and goods determine a child's educational attainment.  [D.E. 222-2 at 17].  These factors, and the level of post-school investment (e.g., work experience), all affect a child's earnings and income.  [*Id.*].  The article concludes that parents make a wide variety of decisions that can be expected to be related to their child's schooling and labor market attainments.  [*Id.*].  From these statements, and purportedly applying economic theory and logic, Dr. Paranjpe extracts the premise that removal of a father results in a loss that can be measured by a lowering of educational attainment and, therefore, a lowering of income of that child.  However, Dr. Paranjpe does not offer any other support, e.g., data, analysis, or scholarly work, to support this premise.

Dr. Paranjpe has not demonstrated how his opinion that a child with a deceased parent is less likely to attend college is in any way related to or regarded as a standard for determining loss of parental training and guidance.  He does not present any scientific evidence that loss to a child is quantified by the difference in lifetime earnings between high school and college degree attainment, nor does he propose how lost earnings are tied to the emotional loss inherent in the death of a parent.

The Advisory Committee Notes to the 2000 Amendments to Rule 702 specifically provide that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. As the court noted in *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir. 1994), "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*" *Id.* (emphasis in original). Further, nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1977).

We find an analytical gap, indeed an analytical chasm, between the concept set forth in the Haveman & Wolfe article and Dr. Paranjpe's conclusion about lowering of educational attainment as well as his ultimate opinion that the "the loss of [Hailey's] father has put her at risk [that can be] measured by the difference between the college degree compensation and high school compensation. . . ." [D.E. 172-3 at 11]. Plaintiffs have not shown that this opinion (1) can be or has been tested; (2) that it has been subjected to peer review; (3) any potential rate of error; and (4) that it has been generally accepted in the scientific community. *Quiet Technology*, 326 F.3d at 1341. Accordingly, we find Dr. Paranjpe's opinion – that an accepted measure of the loss of

11

parental training and guidance is the difference between Hailey's earnings if she attends college and those if she merely attends high school – is highly speculative and unreliable.

We note that Dr. Paranjpe was careful to avoid opining that Hailey's loss will *absolutely* result in her not attending college.

> It's not a question of if she doesn't go on because I really don't know if she would go past high school or not. The question is, as an economist I know if you withdraw a resource that's involved in the upbringing of a child the child is now at risk.
>
> * * *
>
> And the risk is measured in terms of A, a diminishment of educational attainment, and subsequent to that a diminishment of income loss. So I can provide the trier of fact an idea that there's a risk involved. How precisely that risk would be borne out I don't think I can provide.

[*Id.* at 9, p. 30 l. 1-12]. However, it is clear that the conclusion that she will suffer a loss in educational attainment due to the death of her father is at the heart of his opinion regarding the proper measurement of risk to her, because his only measure of risk is just that, i.e., the difference between college-educated compensation and high school-educated compensation. Allowing Plaintiffs to put these figures before the jury would validate Dr. Paranjpe's theory and very likely confuse the jury.

Moreover, a child's loss of nurture, training and guidance is compensable under a Death on the High Seas Act ("DOHSA"), but is limited to the nurture's pecuniary value as determined by the trier of fact. *Sea-Land Servs., Inc. v. Gaudet,* 414 U.S. 573, *reh'g denied,* 415 U.S. 986 (1974). Without dispute, children may suffer a pecuniary deprivation, apart from the loss of support and financial contributions, from the death

12

of their parents in the form of lost parental training and guidance. *Solomon v. Warren,* 540 F.2d 777, 788 (5th Cir. 1976). However, "this item of damages cannot be computed with any degree of mathematical certainty . . . [and] the wrongful death of a parent standing alone is an insufficient predicate to support recovery by a child of the loss of parental nurture." *Id.* at 788.

There is not any uniform standard recognized by courts for determining the value of lost parental training and guidance. Moreover, we have not found any case in which a child's *potential* lost income due to risk of not attending college was used as a factor for determining the loss. *See, e.g., Maryland Cas. Co. v. Alford*, 111 F.2d 288, 391 (10th Cir.), *cert. denied,* 311 U.S. 668 (1940) (courts should calculate damages for lost parental nurture as the cost of obtaining similar nurture from others); *Shu-Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45 (2d. Cir. 1984) (assessing the pecuniary value of the loss of the nurture, care and guidance from death of a parent is "problematic, and it is hardly surprising that New York courts and juries appear to fashion somewhat arbitrary amounts in doing so."; reversing award for the cost of a psychiatrist because there was no factual basis on which to predict that the children might seek psychiatric care in the absence of their father); *Wentling v. Med. Anesthesia Servs.,* 701 P.2d 939, 947-48 (Kan. 1985) (economist for plaintiff could not place a specific dollar figure on certain economic losses associated with a homemaker's death, including the parental care, services, educational, physical, and moral training and guidance the homemaker would have bestowed on her children, even though he

testified such losses do have real economic value; nevertheless, award was not based on speculation because plaintiff satisfied his burden of showing the nature and extent of these losses, and "the triers of fact are presumed to be capable of converting the losses into monetary equivalents on the basis of their own experience"); *Southlake Limousine & Coach, Inc. v. Brock,* 578 N.E.2d 677, 682 (Ind. Ct. App. 1991) (economist expert's testimony on the loss of parental guidance and training to surviving children was inadmissible in Indiana wrongful death case; jury should be able to determine intangible losses like this based on its own experiences and knowledge, and through the testimony of survivors); *Peters v. Great N. Ry. Co.,* 66 F. Supp. 385, 388 (D. Minn. 1946) (assessment of damages should be left to common sense and sound judgment of jury).

In *Boykin D.Y. A/S v. Bergesen,* 835 F. Supp 274, 286 (E.D. Va. 1993), the plaintiff presented testimonial evidence showing the deceased father was devoted and provided a great deal of care and guidance for his children. After finding the father provided support for his children in an exemplary manner and that he was exceptionally fit to furnish support, the court sought to establish the pecuniary value of those services for each child. *Id.* It looked to *Brown v. United States*, 615 F. Supp. 391, 400 (D. Mass. 1985), where the death of a father who was frequently absent from his child (because he was a fisherman) had an estimated pecuniary value of $5,000 per year until the age of eighteen. *Id.* The *Boykin* court also looked to *Solomon*, where the Fifth Circuit upheld a nurture and guidance award of $12,000 per year for one child.

*Id.* (citing *Solomon,* 540 F.2d at 786). Given the father's profession as a ship's master which required frequent absences from his children, but recognizing he sometimes took the children with him, the *Boykin* court awarded $12,000 a year per child through the age of eighteen to compensate for the loss of parental training and guidance. *Id.* The court indicated it would have allowed submission of inflation or a discount rate, but nowhere indicated that it would consider expert testimony as to the *potential* lost earnings of the minor children. *Id.*

Expert testimony must be properly grounded, well-reasoned and *not speculative* before it can be admitted. Dr. Paranjpe's testimony and calculations assume that Hailey will not graduate from college. He argued that he is simply assisting the trier of fact in determining an economic value of harm once it considers all the evidence in the case, but he ignores the fact that the opinion is premised on an event that has not even had the chance to occur yet: Hailey's matriculation at a post-secondary institution. Without additional support for his assumption, which support is totally absent in this record, Dr. Paranjpe's testimony is untethered to any scientific validity. His opinion is entirely speculative and cannot properly be applied to the facts of this case. *See Daubert,* 509 U.S. at 592.

To put it another way, the fact finder may use its own experiences and other fact witnesses at trial to determine *if* the deceased parent furnished training and guidance and what the value of those services is. Plaintiffs seek to introduce testimony about an individual's potentially lost future earnings but they have failed to present support

15

for their claim that a child's loss of training and guidance due to the death of her father is equal to the difference between the earnings of a female with a college degree and a high school degree. But because the calculations of Hailey's potential lost income are too attenuated and speculative to be reliable under *Daubert*, we must exclude Dr. Paranjpe's testimony on the issue of lost parental training and guidance. Defendants' *Daubert* motion is granted.

### IV.   *CONCLUSION*

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** that Defendant, Carnival Corporation and Carnival Cruise Lines, Inc.'s Motion to Exclude Expert Witness Testimony of Dr. Nitin Paranjpe on the Subject of Lost Earnings of Hailey Kallas [**D.E. 219**] is **GRANTED.**

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of March, 2009.

                                                         */s/ Edwin G. Torres*
                                                       EDWIN G. TORRES
                                                     United States Magistrate Judge